**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| **WESLEY IRA PURKEY** | : | |
| **Register Number 14679-045** | : | |
| **U.S. Penitentiary Terre Haute** | : | |
| **Terre Haute, IN 47802** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case Number 19-cv-3214** |
| | : | |
| **WILLIAM P. BARR** | : | |
| **U.S. Department of Justice** | : | |
| **950 Pennsylvania Avenue NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **KATHLEEN HAWK SAWYER** | : | |
| **Acting Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **U.S. Department of Justice** | : | |
| **320 First St. NW** | : | |
| **Washington, DC 20534;** | : | |
| | : | |
| **JEFFREY E. KRUEGER** | : | |
| **Regional Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **North Central Region** | : | |
| **U.S. Department of Justice** | : | |
| **400 State Avenue, Suite 800** | : | |
| **Kansas City, KS 66101;** | : | |
| | : | |
| **JOSEPH McCLAIN** | : | |
| **United States Marshal** | : | |
| **Southern District of Indiana** | : | |
| **U.S. Courthouse** | : | |
| **46 E. Ohio Street, Room 179** | : | |
| **Indianapolis, IN 46204;** | : | |
| | : | |
| **RADM CHRIS A. BINA** | : | |
| **Acting Assistant Director** | : | |
| **Health Services Division** | : | |
| **Federal Bureau of Prisons** | : | |
| **320 First St. NW** | : | |
| **Washington, DC 20534;** | : | |

**T.J. WATSON**                           :
**Complex Warden**                        :
**U.S. Penitentiary Terre Haute**         :
**4700 Bureau Road South**                :
**Terre Haute, IN 47802;**                :
                                          :
**WILLIAM E. WILSON, M.D.**               :
**Clinical Director**                     :
**U.S. Penitentiary Terre Haute**         :
**4700 Bureau Road South**                :
**Terre Haute, IN 47802;**                :
                                          :
**and**                                   :
                                          :
**JOHN DOES I-X,**                        :
                                          :
**In their official capacities,**         :
                                          :
                **Defendants.**           :

## COMPLAINT

### I. Nature of Action

1.     Plaintiff Wesley Ira Purkey brings this action for injunctive and declaratory relief for violations of the First, Fifth, and Eighth Amendments of the U.S. Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

2.     In 2004, Mr. Purkey was sentenced to death under federal law.

3.     On July 25, 2019, after years without an operative federal lethal injection protocol, the United States Department of Justice ("DOJ") announced a new lethal injection protocol for the Federal Bureau of Prisons ("BOP"). This protocol replaces the three-drug combination previously used for federal executions with a single drug: sodium pentobarbital ("pentobarbital").

4.      Mr. Purkey was recently informed that he is scheduled to be executed on December 13, 2019 pursuant to the new protocol that has not been made public by Defendants, who include the individuals responsible for carrying out Mr. Purkey's death sentence.

5.      As alleged in more detail below, the new protocol violates Mr. Purkey's constitutional rights and the APA.

6.      On information and belief, the new protocol presents a "substantial risk of serious harm" to Mr. Purkey.  *Baze v. Rees*, 553 U.S. 35, 50 (2008).  Executing Mr. Purkey using the new protocol would violate his Eighth Amendment right to be free from cruel and unusual punishment.

7.      The First and Fifth Amendments guarantee Mr. Purkey's right to access the courts.  As described in more detail below, the operative protocol limits communications between Mr. Purkey and his counsel, as well as communications between Mr. Purkey's counsel and the courts.  As a result, Mr. Purkey will be unable to assert an Eighth Amendment violation occurring prior to or during his execution.  This interference with communication violates Mr. Purkey's right to access the courts as guaranteed by the First, Fifth, and Eighth Amendments of the U.S. Constitution.

8.      Defendants' failure to provide Mr. Purkey with notice and the opportunity to be heard before the procedure for his execution was selected violates Mr. Purkey's rights under the Due Process Clause of the Fifth Amendment.  Mr. Purkey was given no notice of the protocol prior to its announcement and has not had the opportunity to raise questions or concerns about the new protocol.

9.      The APA prohibits an agency from taking action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or that is "in excess of statutory

jurisdiction, authority or limitations."  5 U.S.C. § 706(2)(A), (C).  Defendants have violated these provisions of the APA by adopting a protocol that is contrary to the Federal Death Penalty Act ("FDPA") and the Controlled Substances Act ("CSA") and without engaging in reasoned decision-making.

10.     The APA also requires an agency to provide adequate notice to the public regarding the nature, scope and any effects of a proposed or final agency action; a full and fair opportunity to comment; and an explanation of the rule ultimately adopted.  *See* 5 U.S.C. § 553(b) and (c).  Defendants took none of these steps prior to enacting the new lethal-injection protocol.

11.     Mr. Purkey therefore seeks (i) a preliminary and permanent injunction preventing the implementation of the new protocol, (ii) an order declaring that the new protocol violates the APA as well as the First, Fifth, and Eighth Amendments of the U.S. Constitution, and (iii) such other equitable relief as this Court deems just and proper.

12.     Mr. Purkey does not seek relief in this suit from his underlying convictions or sentence.[1]  Instead, he seeks to prevent Defendants from executing him in a way that violates his constitutional and statutory rights.  This complaint is not a successor habeas corpus petition and should not be considered as one.

## II.  Parties

13.     Mr. Purkey is a U.S. citizen.  He is a death-sentenced inmate incarcerated in Terre Haute, Indiana ("USP Terre Haute") under the supervision of the BOP, an agency within the DOJ.

---

[1] Mr. Purkey has separately filed a habeas petition that is pending before the Southern District of Indiana.  *See Purkey v. Warden of USP Terre Haute*, 2:19-cv-00414 (S.D. Ind.).

14.     Defendant William P. Barr is the Attorney General of the United States.  Mr. Purkey was remanded into the Attorney General's custody upon his conviction and the imposition of his death sentence.  The Attorney General is the executive responsible for carrying out death sentences against federal prisoners.  Mr. Barr is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Kathleen Hawk Sawyer is the Acting Director of the BOP.  She is charged with prescribing and directing the promulgation of the BOP's rules and regulations, including those relating to the conduct of prisons.  Ms. Hawk Sawyer is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

16.     Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP.  He is responsible for overseeing operations at USP Terre Haute and plays a critical role in the promulgation of its rules and regulations, including the rules and regulations for the conduct of prison operations and executions.  Mr. Krueger is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17.     Defendant Joseph McClain is the U.S. Marshal for the Southern District of Indiana.  As such, he directs the personnel who administer lethal injections.  Mr. McClain is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

18.     Defendant Rear Admiral Chris A. Bina is the Acting Assistant Director, Health Services Division, of the BOP.  He is responsible for overseeing the provision of medical care to prisoners at all BOP facilities, and for promulgating and implementing BOP policy with respect to medical care provided by the BOP.  Mr. Bina is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

19.     Defendant T.J. Watson is the Warden of USP Terre Haute, which is where Mr. Purkey is imprisoned and where current BOP protocol specifies his death sentence will be carried out.  In that position, he is charged with management of USP Terre Haute and the oversight and implementation of operations there, including the oversight and implementation of executions at the prison.  Mr. Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

20.     Defendant William E. Wilson, M.D., is the Clinical Director at USP Terre Haute. He is responsible for overseeing the provision of medical care to prisoners at that facility.  Dr. Wilson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

21.     John Does 1-10 are employed or retained by BOP to consult with, prepare for, and/or carry out Mr. Purkey's execution.  Mr. Purkey does not know, and the Attorney General and the BOP have not revealed, their identities or positions.  They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

22.     Defendants are acting, and at all relevant times were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color or authority of federal law.  Upon information and belief, unless preliminarily enjoined, each of the Defendants intends to act in his or her official capacity and under the color or authority of federal law in executing Mr. Purkey, in violation of his statutory and constitutional rights.

### III.  Jurisdiction and Venue

23.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under the laws and Constitution of the United States, specifically the First, Fifth, and Eighth Amendments and 5 U.S.C. §§ 702, 704, and 706.

24.     Venue is proper under 28 U.S.C. § 1391(b)(2) because DOJ and BOP headquarters are in this District and a substantial part of the events giving rise to the claims herein took place in the District—specifically, the formulation of the new protocol.

## IV.  Factual Background

### A.     Mr. Purkey's Conviction and Sentence

25.     In 2003, Mr. Purkey was convicted of kidnapping resulting in death in the U.S. District Court for the Western District of Missouri.  On January 23, 2004, he was sentenced to death.  The U.S. Court of Appeals for the Eighth Circuit affirmed his conviction and sentence on November 7, 2005.  On October 16, 2006, the U.S. Supreme Court denied Mr. Purkey's petition for a writ of certiorari.

26.     On October 16, 2007, Mr. Purkey filed a Motion for Relief Pursuant to 28 U.S.C. § 2255.  The U.S. District Court for the Western District of Missouri denied Mr. Purkey's motion, his subsequent motion seeking to alter or amend the judgment, and his subsequent motion for a certificate of appealability ("COA").  The court of appeals granted a COA on the issue of whether Mr. Purkey received ineffective assistance of counsel under the Sixth Amendment during the penalty phase of his trial, but ultimately affirmed the denial of Mr. Purkey's § 2255 Motion on September 6, 2013.

### B.     The BOP's Lethal-Injection Protocol

27.     The DOJ previously determined that it was required to engage in notice-and-comment rulemaking before adopting an execution procedure.

28.     On November 30, 1992, the DOJ published a proposed rule seeking to "establish[] procedures" for carrying out federal death-penalty sentences.  57 Fed. Reg. 56,536 (1992).  The DOJ considered comments from medical associations, physicians, criminal-defense attorneys, and advocates for prisoners' rights before issuing a Final Rule that took effect on February 18,

1993.  58 Fed. Reg. 4898 (1993) ("Final Rule").  The Final Rule, however, contains little detail about the method of execution, including the drug (or drugs) to be used.

29.     Subsequently, the DOJ and BOP have made all critical and substantive determinations about the federal execution procedure without engaging in the rulemaking process.

30.     In 2004, Defendants adopted—without notice or comment—a protocol (the "2004 Main Protocol") providing additional detail about how executions would be carried out, such as listing persons responsible for various tasks leading up to and following an execution.  Although the 2004 Main Protocol contained significantly more information than the Final Rule, it, too, was silent as to the drug to be used in executions.

31.     The BOP updated the 2004 Main Protocol via a three-page addendum in 2007 and again in 2008 ("2008 Addendum").  Only in these addenda did the BOP finally announce the specific drugs that would be used to execute federal prisoners.

32.     The 2008 Addendum provided for the use of three drugs: sodium pentothal, pancuronium bromide, and potassium chloride.  Until July 2019, the 2008 Addendum together with the 2004 Main Protocol constituted the operative federal lethal-injection protocol; they are referred to below collectively as the "2008 Protocol."

33.     In May 2011, the BOP announced that it lacked the drugs necessary to implement the 2008 Protocol and was considering revisions to the execution protocol.  Accordingly, since May 2011, there has not been an operational execution protocol.

34.     At the time of the 2011 announcement, several lawsuits challenging the 2008 Protocol had been filed in this Court.  When the BOP announced that it would not be

implementing that protocol, the litigations were stayed.  In the years that followed, the BOP

continued to submit status reports stating that revisions were ongoing.

      **C.**     **Adoption of the 2019 Protocol**

     35.     On July 25, 2019, the DOJ announced that the BOP had adopted a new

addendum, which replaces the previous three-drug protocol with the single drug pentobarbital.

*See* Ex. 1 ("2019 Addendum").  The 2019 Addendum also removes several other key provisions

from the prior addendum, including a provision detailing a plan for unexpected occurrences

during executions.

     36.     Prior to July 25, 2019, the DOJ and BOP provided no information to the public

about the formation of the 2019 Addendum.

     37.     The BOP also adopted a new protocol to replace the 2004 Main Protocol, which

was not mentioned in the DOJ's public announcement ("2019 Main Protocol").  *See In the*

*Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-00145 (D.D.C.)

("Related Litigation") Dkt. #13-1 at 15; Dkt. #4-1 at 5 (administrative record listing "BOP

Execution Protocol").

     38.     The DOJ and BOP have provided no information to the public about the

formation or contents of the 2019 Main Protocol.  Instead, the DOJ disclosed it for the first time

as part of the administrative record filed in a related case pending in this District.  The DOJ has

not released the 2019 Main Protocol to the public.

     39.     Both the 2019 Main Protocol and 2019 Addendum (referred to collectively as the

"2019 Protocol") constitute DOJ/BOP "statement[s] of general or particular applicability and

future effect designed to implement, interpret, or prescribe law or policy or describing the

organization, procedure, or practice requirements of an agency."  5 U.S.C. § 551(4).  The DOJ

and BOP were therefore required to publish proposed rules and allow the public an opportunity

to comment prior to adopting them.  5 U.S.C. § 553(b)(1)-(3), (c).  Their failure to do so violated the APA.

### D.     The 2019 Protocol

40.     Although the 2019 Protocol contains some information about the execution drug and procedure to be used in Mr. Purkey's execution, it lacks details about the methodology to be used and safeguards that are critical to ensuring executions are implemented professionally and without needless pain.  For example, the 2019 Protocol fails to address the following factors, among others:

a.     the form and source of the pentobarbital to be used, including whether the drug will be FDA-approved, compounded, and/or imported;

b.     the methods for obtaining, storing, mixing, and labeling the pentobarbital and recording the chain of custody for the pentobarbital;

c.     testing of the pentobarbital at regular intervals to ensure, at a minimum, identity, purity, and potency, and conveyance of test results to condemned prisoners facing execution prior to their execution;

d.     the manner in which IV catheters shall be inserted into the prisoner and the amount of tubing that will be used, if any;

e.     the manner in which a monitoring system shall be installed and used to confirm that the prisoner is deeply sedated while dying; the qualifications and expertise required for the person who operates this equipment; and the manner in which the condition of the condemned prisoner will be monitored to confirm that the protocol is not inflicting severe and unnecessary pain;

    f.      the manner in which the IV tubing, three-way valve, saline solution or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion; and

    g.      the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering, and the criteria to be used in exercising this discretion.

41.      The 2019 Protocol specifically removed the provision of the prior protocol that established a procedure for handling unanticipated situations during an execution.  In particular, the 2008 Protocol provided a plan in the event that "at any time during the federal death penalty procedure a member of the execution team becomes aware of a situation not contemplated in this procedure," assigning specific responsibilities to a supervisory BOP team member, the Director's on-site designee, the U.S. Marshal, and on-site medical personnel.

42.      The information that *is* included in the 2019 Protocol provides little actual notice of the procedures to be used due to internal inconsistencies and the broad discretion it provides the Defendants to change or deviate from the announced procedures.

43.      For example, it is not clear from the 2019 Protocol who will select the executioners.  The newly announced addendum states that the lethal injection will be "administered by qualified personnel selected by the Warden and acting at the direction of the

United States Marshal." 2019 Addendum ¶ A. But it also states that "qualified personnel" shall be selected by the "[BOP] Director, in conjunction with the United States Marshal Service." *Id.* ¶ D.

44.     The 2019 Protocol also gives the Director of the BOP, or any designee, discretion to deviate from any of the provisions "as may be required by … circumstances," providing virtually unlimited discretion to vary from the protocol. 2019 Addendum ¶ A.

**E.     Pentobarbital**

45.     The 2019 Protocol identifies pentobarbital as the single drug to be used to execute Mr. Purkey. Pentobarbital is a barbiturate that affects the brain and nervous system. It is used as a pre-anesthetic, a sedative, and to treat brain-swelling, seizures, and insomnia.

46.     The use of pentobarbital for executions presents serious risks unless proper precautions are taken.

47.     Pentobarbital—like any drug—may be inadvertently injected into tissue other than a vein. This is called "extravasation." Drugs like pentobarbital that have an alkaline pH that is significantly higher than the pH of normal blood can cause tissue damage and severe pain as a result of extravasation. *See* Ex. 2, *In re Ohio Execution Protocol Litig.*, 2:11-cv-1016 (S.D. Ohio), Expert Report of Dr. Mark Edgar, Dkt. # 2035-1 at ¶ 74 ("Edgar Report"). Dr. David Waisel, Anesthesiologist at Boston Children's Hospital and Associate Professor of Anesthesia at Harvard Medical School, has stated that the extravasation of 5 grams of pentobarbital—the exact amount called for in the 2019 Protocol—"to a reasonable degree of medical certainty … would cause excruciating and unrelenting pain." Ex. 3, *Creech v. Reinke*, 12-00173 (D. Idaho), Affidavit of Dr. David B. Waisel, M.D., Dkt. # 30 at ¶ 7.

48.     The injection of pentobarbital can also cause pulmonary edema.  Pulmonary edema can cause pain and suffering, and can "produce[] panic and terror."  Ex. 3 ¶ 12.  Autopsies on prisoners executed with pentobarbital have confirmed the presence of pulmonary edema.

49.     The 2019 Protocol is silent as to the source of the pentobarbital to be used. However, Defendants have stated their intent to execute Mr. Purkey using a version of pentobarbital that is made by a compounding pharmacy.  *Related Litigation*, Dkt #16 at 8.

50.     Compounding pharmacies are subject to less rigorous regulation and oversight than are drug manufacturers, meaning that compounded products are not tested thoroughly for safety and efficacy.  Compounding injectable pentobarbital outside an FDA-approved facility poses a substantial risk that the purity, efficacy, and sterility of the drug will be compromised, resulting in a painful or even torturous death.

51.     There are numerous documented incidences of compounding pharmacies engaging in dangerous conduct.  Texas reportedly has purchased its supply of execution drugs from a compounding pharmacy that the Texas State Board of Pharmacy had cited for 48 violations over eight years, including "keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves."  *See* McDaniel, *Inmates Said The Drug Burned As They Died.  This Is How Texas Gets Its Execution Drugs.*, Buzzfeed News (Nov. 28, 2018), https://www.buzzfeednews.com/article/chrismcdaniel/ inmates-said-the-drug-burned-as-they-died-this-is-how-texas ("McDaniel Article").  The company's license was on probation beginning in 2016 after the Texas State Board of Pharmacy found that it had compounded the wrong drug for three children and forged quality control documents.  The next year, the same pharmacy was warned by the Food and Drug Administration about deficiencies in its practices for producing sterile drug products.

52.     Likewise, Missouri reportedly purchased pentobarbital from a pharmacy that has repeatedly been found to engage in hazardous pharmaceutical procedures.

53.     The use of compounded pentobarbital in executions is a known cause of unnecessary pain and suffering.  At least five out of eleven people executed in Texas in 2018 alleged that the drug caused a burning feeling as they died.  *See* McDaniel Article.  Similarly, Michael Lee Wilson in Oklahoma cried out during his execution: "I feel my whole body burning!"  *See* Ex. 4, *Taylor v. Apothecary Shoppe, LLC.*, 4:14-cv-00063 (N.D. Okla.), Dkt. #2, Declaration of Dr. Larry D. Sasich at 13 ¶ 60.  These reactions are consistent with the receipt of contaminated pentobarbital.

54.     Witnesses to the execution of Eric Robert, in South Dakota, reported that he appeared to clear his throat and gasp heavily, at which point his skin turned bluish-purple.  He opened his eyes and they remained open until his death; his heart continued to beat for ten minutes after his breathing ceased.  This reaction is also consistent with the use of a contaminated or sub-potent drug product.  *Id.* at 13 ¶ 62.

**F.     Mr. Purkey's Challenge**

55.     On July 25, 2019, Mr. Purkey received a letter from Mr. Watson informing him that he would be executed on December 13, 2019.

56.     The government was required to "promptly file with the sentencing court a proposed Judgment and Order" containing certain information.  28 C.F.R. 26.2(a).  Rather than comply with its own regulation, the government did not do so.

57.     The DOJ was solely responsible for enacting the 2019 Protocol proposed by the BOP.

58.     Nevertheless, Mr. Purkey exhausted his administrative remedies within the BOP.

59.     Immediately upon receiving the letter, Mr. Purkey submitted a BP-11 to the Central Office of the BOP.  Upon information and belief, the Central Office prescribes and directs the promulgation of the BOP's rules and regulations.

60.     In his BP-11, Mr. Purkey asserted that the method of execution to be utilized by the BOP violated his Fifth and Eighth Amendment rights as well as various statutes, including the FDPA.  He noted the lack of information he had been provided about the procedures and sought further information regarding the protocol.  On September 11, 2019, the Central Office denied his BP-11.

**G.     Alternatives**

61.     There are multiple feasible alternatives that could be readily implemented to significantly improve the execution procedure in ways that would minimize the chances of complications and reduce the risk of pain to Mr. Purkey.

62.     First, the implementation of procedural safeguards presents a straightforward and available alternative to the defective 2019 Protocol.  The DOJ and BOP can and should incorporate safeguards to ensure:

(1)  That all members of the execution team are appropriately qualified, competent, and vetted, and that their specific qualifications are disclosed.  Pursuant to the 2019 Protocol, an execution can be performed wherein no one present has any medical experience beyond two execution training sessions.  Ex. 1 ¶ D.

(2) That no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional, and that any central lines will be set only by qualified and competent medical professionals.

(3) That the pentobarbital be FDA-approved or compounded by a pharmacy that complies with all state and federal compounding requirements; that the pentobarbital be tested appropriately, with the records of this testing and chain of custody documentation provided to the prisoner; and that the compounding formula is disclosed to prisoners and their counsel.

(4) That appropriate procedures are in place to respond to unexpected occurrences during an execution.

Upon information and belief, these safeguards are available, are feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

63.     Second, the bedside—rather than remote—administration of pentobarbital could reduce or eliminate several of the deficiencies in the 2019 Protocol.  Eliminating the need for extension sets of IV tubing can significantly reduce the risks of leakage or pinching of the tubing.  Bedside administration would also ensure adequate surveillance and monitoring of the IV, the catheter site, and the prisoner.  And, by eliminating the need for lengthy IV tubing, bedside administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing.  Upon information and belief, bedside administration is available, is feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

64.     Third, along with incorporating safeguards and transparency into the pentobarbital protocol, the DOJ and BOP could add a large, clinical pre-dose of either an opioid or an anti-anxiety medication.  This pre-treatment of the prisoner would substantially reduce the risk that the prisoner would remain sensate to experience pain.

65.     Upon information and belief, a pentobarbital protocol with transparency, safeguards and pre-treatment constitutes an alternative procedure that is available and feasible, and it would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

## V.  Claims for Relief

### Count I

### (Violation of the Eighth Amendment)

66.     Mr. Purkey realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

67.     The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" in carrying out death sentences.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion); *see also In re Kemmler*, 136 U.S. 436, 447 (1890) (it is unconstitutional to inflict pain beyond what is necessary to end the prisoner's life).  An execution violates the Eighth Amendment if it presents a "substantial risk of serious harm."  *Baze*, 553 U.S. at 50.

68.     Defendants, acting under color of federal law, intend to execute Mr. Purkey under a vague protocol using means that are known to be unreliable, creating a significant risk of causing Mr. Purkey unnecessary pain.  Because the 2019 Protocol poses a substantial risk of serious harm to Mr. Purkey, it violates his Eighth Amendment right to be free from cruel and unusual punishment.

69.     The alternative protocol described above is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain."  *Baze*, 553 U.S. at 52.

### Count II

### (Violation of the First, Fifth, and Eighth Amendments: Access to the Courts)

70.     Mr. Purkey realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

17

71.     The First and Fifth Amendments of the U.S. Constitution guarantee inmates the right to access the courts.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Wolff v. McDonnell*, 418 U.S. 539, 578-79 (1974).

72.     To assert an Eighth Amendment violation prior to and during execution, an inmate must be able to communicate that violation to his counsel, and counsel, in turn, must be able to access the courts on the inmate's behalf.  Abridgement of either inmate-counsel contact or counsel's contact with the courts violates an inmate's right of access.  *See, e.g.*, *Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at *5-12 (S.D. Ohio Jan. 28, 2011); *Hoffman v. Jindal*, No. 12-796, 2014 WL 130981 *6-7 (M.D. La. 2014); *McGehee v. Hutchinson*, No. 4:17-cv-00179, 2017 WL 1381663, at *28-30 (E.D. Ark. Apr. 15, 2017).

73.     The 2019 Protocol abridges communications between Mr. Purkey and his counsel, as well as communication between his counsel and the court, prior to and during the execution. Under the 2019 Protocol, an inmate may visit with his counsel in the three to 24 hours prior to his execution, only at the warden's discretion.  *See* 2019 Main Protocol, ch. 2, II(B)(2), III(C). The 2019 Protocol does not provide for visits with counsel following that time.  *See id.* ch. 2, IV, V.  Nor does the protocol guarantee that counsel will have ready access to a telephone during the execution.  *Id.*  Moreover, it is not clear under the protocol whether attorneys, or other witnesses, will be permitted to view the setting of IVs.  *See id.* ch. 2, VI; Ex. 1 ¶ G.  Those witnesses therefore may not be able to discern if there are issues with the IV-setting process.

74.     The 2019 Protocol violates Mr. Purkey's rights under the First, Fifth, and Eighth Amendments of the U.S. Constitution because it does not ensure that he will have meaningful access to the courts.

**Count III**

**(Violation of the Fifth Amendment: Due Process Clause)**

75.     Mr. Purkey realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

76.     The Due Process Clause of the Fifth Amendment requires notice and an opportunity to be heard prior to the deprivation of life, liberty, or property.

77.     Defendants did not provide Mr. Purkey with notice or an opportunity to raise questions or concerns prior to promulgating the 2019 Protocol.  Executing Mr. Purkey pursuant to the new protocol without providing him due process would violate his Fifth Amendment rights.

**Count IV**

**(Violation of the APA: Regulation Contrary to Law)**

78.     Mr. Purkey realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

79.     Under the APA, a reviewing court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or any agency action that is "in excess of statutory jurisdiction, authority or limitations."  5 U.S.C. § 706(2)(A), (C).

80.     The 2019 Protocol violates the FDPA.  The FDPA establishes a particular procedure to be used in carrying out federal death sentences:  The U.S. Marshals Service is to "supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed."  18 U.S.C. § 3596(a).  The FDPA further provides that "[i]f the law of the State [in which the sentence was imposed] does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the

19

implementation of a sentence of death, and the sentence shall be implemented in the latter State

in the manner prescribed by such law." *Id.*

81. The 2019 Protocol instead establishes a distinct federal execution procedure that

is different than the procedures used by many—and potentially all—states. The federal

procedure established by the 2019 Protocol directly conflicts with the FDPA.

82. The 2019 Protocol also violates the CSA. The CSA makes it unlawful to

"dispense" any "controlled substance," 21 U.S.C. § 841(a)(1), except pursuant to a valid

prescription "issued for a legitimate medical purpose" by a practitioner who is "acting in the

usual course of professional practice" and registered pursuant to the statute. 21 U.S.C.

§§ 802(21) and 829(e)(2).

83. Pentobarbital is a Schedule II controlled substance.

84. Upon information and belief, the 2019 Protocol calls for the dispensing of

pentobarbital absent a valid prescription by persons who lack a valid registration, in direct

conflict with the CSA.

85. The DOJ does not have the authority to implement rules that directly conflict with

federal statute.

86. Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to

5 U.S.C. § 706(2)(A) and/or (C).

### Count V

### (Violation of the APA: Lack of Notice-and-Comment Rulemaking)

87. Mr. Purkey realleges and incorporates herein by reference all of the preceding

paragraphs of the Complaint as if set forth in full below.

88.     The APA requires agencies to provide adequate notice to the public regarding the nature, scope, and any effects of a proposed or final agency action; a full and fair opportunity to comment; and an explanation of the rule ultimately adopted.  *See* 5 U.S.C. § 553(b) and (c).

89.     Any agency action taken "without observance of procedure required by law" must be set aside.  5 U.S.C. § 706(2)(D).

90.     Defendants failed to provide the public—including Mr. Purkey—with adequate notice and opportunity to be heard prior to promulgating the 2019 Protocol.  Defendants provided the public with no information at all prior to announcing the 2019 Addendum.  And Defendants *still* have not released the 2019 Main Protocol to the public.  The public has never had an opportunity to consider and comment on the lethal substances to be used in federal executions.

91.     Defendants' total failure to inform the public about the contents of the 2019 Protocol prior to its enactment deprived the public—including Mr. Purkey—of the right to consider and address concerns about the substantial probability that the new protocol will result in cruel and unusual punishment and the deprivation of various constitutional rights.

92.     Accordingly, the 2019 Protocol should be held unlawful to and set aside pursuant to 5 U.S.C. § 706(2)(D).

## Count VI

### (Violation of the APA: Arbitrary and Capricious Agency Action)

93.     Mr. Purkey realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

94.     The APA prohibits agencies from taking action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).  Agency action that is not the product of reasoned decision-making is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut.*

*Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency must be able to "cogently explain why it has exercised its discretion in a given manner."  *Id.* at 48.

95.     Defendants have provided no explanation for the 2019 Protocol.  The administrative record filed in the Related Litigation reflects little internal deliberation.  *See* Related Litigation, Dkt. #4, Dkt. #13-1 at 6-7.  In fact, in its rush to execute Mr. Purkey, the DOJ ignored its own regulations to "promptly file with the sentencing court a proposed Judgment and Order" providing specific information about Mr. Purkey's execution.  28 C.F.R. § 26.2(a).

96.     Thus, the adoption of the 2019 Protocol was arbitrary and capricious in violation of the APA.  Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D).

## VI.  Prayer for Relief

97.     WHEREFORE, in order to prevent Defendants from violating Mr. Purkey's rights under the First, Fifth, and Eighth Amendments to the U.S. Constitution and the Administrative Procedure Act as alleged above, Mr. Purkey requests that the Court enter a judgment:

    a.    declaring the 2019 Protocol contrary to the U.S. Constitution and the APA;

    b.    vacating the 2019 Protocol and enjoining Defendants and all persons acting on their behalf from using the 2019 Protocol, or any revised protocol or addendum that violates Mr. Purkey's rights and the law for the same reasons challenged above;

    c.    granting Mr. Purkey his reasonable attorneys' fee pursuant to 42 U.S.C. § 1988 and the laws of the United States; and

    d.    granting such further relief as the Court deems just and proper.

DATED:        October 25, 2019                Respectfully Submitted,

                                              /s/ Arin Smith

                                              Arin Smith (D.C. Bar No. 1045248)
                                              WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                              1875 Pennsylvania Avenue NW
                                              Washington, DC 20006
                                              (202) 663-6959

                                              Alan Schoenfeld (*pro hac vice*
                                              forthcoming)
                                              Ryan Chabot (*pro hac vice* forthcoming)
                                              WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                              7 World Trade Center
                                              250 Greenwich Street
                                              New York, New York 10007
                                              (212) 230-8800

                                              *Attorneys for Plaintiff*